## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHAIDON BLAKE,

    Plaintiff,

    v.                                   Civil Action No.:  PWG-20-3563

ROBERT L. GREEN,
   *Secretary, Public Safety and Corr. Svcs.*

    Defendant.

### MEMORANDUM OPINION

Pending before the Court is Plaintiff Shaidon Blake's *pro se* request for injunctive relief seeking a transfer from the Kansas State correctional facility to which he was involuntarily transferred by the Maryland Division of Correction.  ECF No. 1.  Counsel for the Maryland Division of Correction has filed a response to this Court's Order to Show Cause why injunctive relief should not be granted.  ECF No. 6.  Blake has filed a reply.  ECF No. 7.  Counsel filed a Surreply addressing the additional evidence presented by Blake.  ECF No. 8.  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2018).

### Background

### I.    Complaint Allegations

Shaidon Blake is a Maryland inmate who was ordered to serve a life sentence by the Circuit Court for Baltimore City following his conviction on charges of second-degree murder and conspiracy to commit murder.  *See Blake v. John Wolf, et al.*, Mem., ECF No. 39, in Civil Action PWG-13-1160 (D. Md. 2013) (denying Blake's petition seeking federal habeas relief under 28 U.S.C § 2254).  The criminal trial included evidence that Blake was an active member of the street gang known as the Bloods and held a leadership position in the gang.  *Id.*

In his complaint, Blake states that he was improperly transferred to Kansas involuntarily under the Interstate Corrections Compact (ICC). ECF No. 1 at 2. He states that the transfer has "placed [him] in a situation where access to the courts has been interfered with" and his "legal mail is always delayed beyond a reasonable time." *Id*. He claims that the "Circuit Court for Baltimore issued a 15 day show cause order concerning [his] appeal but due to the ICC program . . . his legal mail was not sent directly to him." *Id*. He states that the mail was first sent to the Maryland Department of Correction's headquarters, re-routed to the Kansas Department of Correction's headquarters, and then it was delivered to him two weeks after the order was issued. *Id*. In Blake's view, the delay caused him to lose a chance to "appeal for out of time."[1] *Id*.

In addition to the issues with his legal mail, Blake claims that the conditions under which he is confined in Kansas "are not legal." ECF No. 1 at 2. He explains that pursuant to the contractual arrangement between Maryland and Kansas under the ICC, the conditions of his confinement are governed by Maryland law. He contends that under Maryland law, he cannot be placed in long-term segregation without being afforded a hearing first. *Id*. He claims he received a "disciplinary report" in the Kansas prison that resulted in a segregation sentence, but when that sentence was completed, he was placed in "long term seg" for the same infraction "in violation of jeopardy laws." *Id*. He adds that he is currently confined in long term segregation for infractions for which he never received a hearing, in violation of his due process rights. *Id*. Blake filed a civil rights action against Kansas prison officials and claims he has now been targeted in retaliation for the lawsuit. *Id*. He explains that while he was incarcerated in Maryland for approximately 14 years, he received one infraction; in the past year during his confinement in Kansas, he has received more than 12 infractions. *Id*.

---

[1]    It is not clear if the "appeal" concerns Blake's criminal conviction.

Blake also takes issue with the quality of medical care he has received in Kansas, alleging that he was misdiagnosed with angina and "A-fib" and prescribed medication for both conditions, in addition to medication he receives for PTSD, which caused him to go into heart failure.  ECF No. 1 at 3.  He claims that doctors in Kansas prescribed three different antihistamines which, when combined with other prescribed medications, caused him permanent heart damage.  *Id*.  He claims that two cardiologists told him that this was the cause of his heart damage.  *Id*.  He states that when he arrived in Kansas, he was given a heart stress test that revealed there was no damage to his heart.  *Id*.  He claims "[t]his had changed due to medical negligence while housed in Kansas."  *Id*.

In addition, Blake claims he contracted COVID-19 from Kansas prison staff because of a "lack of proper protocol to protect prisoners from getting this deadly virus."  ECF No. 1 at 3.  Blake wrote "several grievances" regarding staff not wearing masks, but to no avail.  *Id*.  He claims his life was endangered by Kansas prison staff when they placed him in a cell that was contaminated with the virus and he became sick 24 hours later.  *Id*.  According to Blake, if Maryland had not sent him to Kansas, he would not have contracted COVID-19.  *Id*.

Blake states he wrote to the Maryland ICC coordinator informing her of the issues he has encountered as a result of his transfer and requesting to "terminate the contract due to violation of the terms and violation of [his] civil rights."  ECF No. 1 at 3.  He seeks an injunction requiring his transfer back to Maryland and prohibiting any other transfer outside of the State.  *Id*. at 1.

## II.    Response to Show Cause

On May 20, 2018, Blake was involuntarily transferred to Kansas under the ICC after Maryland prison officials received information regarding a credible threat to his life.  ECF No. 6-1 at 1, ¶ 4 (Declaration of Kristina Donnelly, Special Asst. to Dep. Sec. for Operations).  No details regarding the threat and how it was verified have been provided.

On August 9 and September 4, 2019, the Maryland Department of Public Safety and Correctional Services (DPSCS) received letters from Blake requesting a return to Maryland.  *Id.* at ¶ 6.  On September 5, 2019, the Commissioner of Correction denied the request because "Blake is not a suitable candidate for return."  *Id.* at ¶ 7.  Donnelly states that she has been advised by prison officials at the Kansas facility where Blake is being held that they have "taken precautions to prevent the spread of COVID-19 by following the guidelines published by the Centers for Disease Control (CDC) and the Kansas Department of Health and Environment."  *Id.* at 2, ¶ 8. Donnelly further observes that DPSCS does not have a policy requiring legal mail to be sent to the DPSCS headquarters to be forwarded to an inmate who has been transferred under the ICC.  *Id.* at ¶ 9.

With regard to Blake's legal proceedings in Maryland, there are four cases listed where Blake is a party.  ECF No. 6-2.  The first case is a habeas corpus petition filed on April 7, 2020, in the Circuit Court for Baltimore City where Blake's address is listed as P.O. Box 311, El Dorado, Kansas 67042.  *Id.* at 2 (Case No. 24H20000167).  Following the State's response to the petition, Blake filed a reply.  *Id.* at 3.  After the matter appeared to be fully briefed, the court issued an order on November 17, 2020, denying the petition.  *Id.*  The entire case was litigated after Blake's transfer to Kansas.

The second case Blake had pending in the Circuit Court for Baltimore City was filed on July 6, 2016.  ECF No. 6-2 at 4 (Case No. 24C16003898).  An order was issued on September 19, 2016, denying Blake's Motion to Waive Pre-payment of the filing fee and providing him with 10 days to pay the costs.  *Id.*  The case appears to have been dismissed before Blake was transferred, but the dismissal order does not appear on the Maryland Judiciary Case Search docket.  *Id.*

The third matter was a "petition to commit to MDH; drug/alcohol eval" filed in the Circuit Court for Baltimore City in Blake's criminal case on February 6, 2018. ECF No. 6-2 at 8 (Crim. Case: 106177028). The petition appears to have been filed by counsel representing Blake. *Id*. The fourth case is also a criminal case in the Circuit Court for Baltimore City with the same pending motion filed by counsel on Blake's behalf. ECF No. 6-2 at 9 (Crim. Case: 106177029).

With regard to Blake's complaints about the medical care and COVID-19 protections in Kansas, Defendant relies upon a Kansas state court's decision finding that the Kansas Department of Correction "provides adequate and reasonable responses to the COVID-19 crisis and that the Eighth Amendment is not being violated." ECF No. 6-4 at 34-35. Defendant provides the following narrative regarding Kansas's response to the pandemic:

> [I]n February 2020, all KDOC pandemic plans were reviewed and approved by the Kansas Department of Health. [ECF No. 6-3] at p. 4. In late February and March, KDOC developed guidance and Prevention and Control of COVID-19 in Correctional and Detention Facilities in corroboration with the University of Kansas Medical Center Office of Health Compliance. *Id*. In March 2020, COVID-19 educational materials were posted throughout the facilities; on March 13, the facilities were closed to all visitors, and various screening processes were initiated on March 18, March 23 and March 25. *Id*. at p. 3. In April, Kansas Correctional Industries started making cloth masks with the goal of distributing 3 masks to each staff member and resident and strategies were developed to provide programming virtually. *Id*. In May, KDOC mass testing at LCF (Lansing Correctional Facility) was completed, *Id*. at p. 2. In June, additional elderly and medically fragile inmates were transferred out of Oswego Correctional Facility from dormitory-style housing so that new social distance target capacity of 100 could be met; by end of summer there was a reduction of 1,200 dormitory-style beds. *Id*. at p. 2. In July, mask requirements were expanded to all facilities, including those without positive resident cases of coronavirus. *Id*. In August, KDOC implemented revised protocols for all facilities regarding hospital use for COVID-19 and developed prioritized hospital admissions. *Id*. In September, there was mandatory training for staff about the "Twindemic" of influenza and COVID-19; received federal funds for purchase [of] additional units/technology to assist virtual programming. *Id*. In October KDOC started an influenza vaccine schedule free to all residents and employees. *Id*. at p. 1. In November, started a revised active screening form based upon public health recommendations and began a saliva-based testing as another option for residents and staff. *Id*.

ECF No. 6 at 3-4.

Blake's allegations concerning the heart damage he sustained are not directly addressed or refuted by Defendant; rather, Defendant suggests that the claims regarding his medical care do not support a constitutional claim because he merely disagrees with the treatment provided and at most states a claim of medical malpractice. ECF No. 6 at 10-11.

## Standard of Review

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), *see also SAS Institute, Inc. v. World Programming Ltd*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying the four-prong test is "a high bar, as it should be."). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

An additional consideration is required when injunctive relief is sought in the context of a prisoner civil rights case: "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the

violation of the Federal right, and is the least intrusive means necessary to correct the violation of

the Federal right."  18 U.S.C. § 3626 (a)(1)(A).  Under 18 U.S.C. § 3626(a)(2):

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief.  Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

*Id*.  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent

with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that

may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555

U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

## Discussion

### I.      Initial Transfer

At issue in this case is the propriety of Blake's involuntary transfer to another State and his

continued stay there.  While Defendant asserts that the decision was motivated by a verified death

threat on Blake's life, Blake claims that the "threat" was made anonymously which is a frequent

practice used by other inmates who want to get rid of someone.  He claims that he has family

members who are incarcerated in Jessup, Maryland that have kept him safe in the past and that he

does not fear an assault.  Notwithstanding Blake's bravado, however, it is still incumbent upon

Maryland's Division of Correction's staff to ensure that there are no violent assaults between inmates. This would include any retribution visited upon another by Blake or his family members.[2]

Without deciding whether there was just cause for Blake's transfer to Kansas, the transfer itself does not run afoul of Blake's constitutional rights to due process. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976), s*ee also Sandin v. Conner*, 515 U.S. 472, 493 (1995) (Breyer, J., dissenting) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest). Therefore, Blake has failed to demonstrate that he has a likelihood of prevailing on the merits of his challenge to his transfer to the Kansas Correctional facility where he is being detained, and his request for injunctive relief on this ground is DENIED. The issue regarding whether Blake's current conditions of confinement are constitutionally sound are examined below.

## II.    Segregated Confinement and Disciplinary Process

Under the ICC, Blake's status as a Maryland inmate remains unchanged. *See* Md. Code Ann., Corr. Servs. § 8-605(c). The Maryland DPSCS retains jurisdiction over Blake, and Kansas, as the receiving state, is obliged to provide "regular reports" to Maryland "including a conduct record of each inmate." *Id*. at § 8-605(d). Additionally,

> All inmates who may be confined in an institution pursuant to the provisions of this Compact shall be treated in a reasonable and humane manner and shall be treated equally with such similar inmates of the receiving state as may be

---

[2] The Show Cause Response does not provide any information about how the threat on his life was verified and whether the threat still exists. Rather, there is simply a conclusory statement that a threat was made, and the ICC transfer ensued. This was unwise. The Court recognizes that there may be concern for the safety of others involved in the decision not to provide more specific information regarding this threat; however, by so doing Defendant lends some credence to Blake's claim that the threat was simply an anonymous ruse to have him moved.

confined in the same institution. The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which the inmate would have had if confined in an appropriate institution of the sending state.

*Id*. at § 8-605(e).  Blake is also entitled to receive "[a]ny hearing or hearings to which" he "may be entitled by the laws of [Maryland]," and Kansas, as the "receiving state shall provide adequate facilities for such hearing conducted by the appropriate officials" in Kansas.  *Id*. at § 8-605(f). Any hearings held in Kansas are governed by the laws of Maryland and the record of such hearings are to be provided to Maryland by Kansas.  *Id*.  Kansas officials "shall act solely as agents of the sending state and no final determination shall be made in any matter except by the appropriate officials of the sending state."  *Id*.  Blake additionally has "any and all rights to participate in and derive any benefits or incur or be relieved of any obligations or have such obligations modified or the inmate's status changed on account of any action or proceeding in which the inmate could have participated if confined in any appropriate institution of the sending state located within such state."  *Id*. at § 8-605(h).

The Response to Show Cause does not include any of the type of documentation contemplated by the ICC with regard to Blake's confinement to disciplinary or long-term segregation.  Blake, however, provides a Disposition of Disciplinary Report documenting a hearing held on August 17, 2020.  The report notes that a portion of the hearing was held in absentia due to his "disrespectful comments towards" the reporting officer ("R/o").  ECF No. 7-2 at 2; ECF No. 7-3 at 2.  Blake was testifying telephonically at the hearings and apparently kept saying the officer was lying.  *Id*.  Defendant filed a response addressing the Disposition of Disciplinary Report submitted by Blake asserting that the report conclusively proves that Blake willfully absented himself from the hearing by hanging up the telephone. ECF No. 8 at 2-3.  The record is devoid of any documentation regarding Blake's assignment to long-term segregation.

While Defendant denies the claim that Blake did not receive due process prior to being confined in long-term segregation, the response provides nothing to dispute his allegation even though the Maryland DPSCS should have received all such reports from the Kansas prison. The unadorned assertion that Blake's due process rights have not been violated, relying solely on the record of one hearing provided by Blake, and that he was not the subject of retaliation by Kansas officials, lacks any objective evidence to support it. Such a cavalier response to the serious issues raised by Blake is inappropriate, and casts doubt on the merits of the arguments that Defendant has raised. Counsel will therefore be required to supplement the Response with all documents received from the Kansas prison regarding Blake's disciplinary proceedings and his assignment to long-term segregation. These documents will be filed electronically with the court as well as in hard copy, and the Defendant shall highlight the portions of the records on which it relies to support its legal position. And, Blake will be served with a hard copy of the highlighted documents.

## III.    Medical Care and COVID-19 Precautions

The Eighth Amendment to the United States Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state a claim for constitutional denial of medical care, a plaintiff must demonstrate that defendant's acts or omissions amounted to deliberate indifference as to plaintiff's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff, aware of prisoner's need for medical attention, failed to either provide such care or ensure the needed

care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).  "A medical condition is shown as objectively serious when it 'would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Formica v. Aylor*, 739 Fed Appx. 745 (4th Cir. 2018), *citing Gayton v. McKoy,* 593 F.3d 610, 620 (7th Cir. 2010).

Additionally, as to a defendant's subjective recklessness, "[t]rue subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the plaintiff demonstrates a defendant's deliberate indifference, an official may nonetheless still avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk that the defendant actually knew at the time.  *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Blake's allegations concerning his misdiagnosis and resultant "permanent" damage to his heart are claims more appropriately brought against the individual medical care providers in Kansas rather than the Secretary of DPSCS.[3]  While supervisory officials may be held liable in certain circumstances for constitutional injuries inflicted by their subordinates, supervisory "liability ultimately is determined 'by pinpointing the persons in the decision-making chain whose

---

[3] Blake indicates that he filed a civil suit for medical malpractice in Kansas which remains pending.  ECF No. 7 at 3-4; ECF No. 7-1.

deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Id.* at 799.

Blake has made no allegations indicating that the Defendant had knowledge of an unreasonable risk of injury or responded with deliberate indifference. Indeed, other than his complaints about the Kansas medical care providers, he has alleged only that the ICC coordinator was made aware that he'd been hospitalized twice due to medical mistakes by medical staff. Blake has failed to demonstrate that he has a likelihood of prevailing on the merits of a claim against the Defendant for supervisory liability based on medical malpractice by the providers in Kansas, and his request for injunctive relief on this ground is DENIED.

In terms of the COVID-19 precautions, Blake has failed to show that he is likely to prevail on his speculative allegations that had he not been transferred to Kansas, he would not have contracted the virus. While there are no guarantees that can be provided to any inmate confined to a correctional institution, there is at least an obligation to formulate a protocol to reduce the possibility that inmates are exposed to the virus. The COVID-19 protocol in place in Kansas mirrors that which has been put into place in Maryland by following the guidelines published by the Centers for Disease Control ("CDC"). *See* ECF No. 6-1 at 2, ¶ 8; ECF No. 6-3 (KDOC COVID-19 Updates Website); ECF No. 6-4 at 33-34. Blake's claims that there are instances where

protocols are not followed by Kansas correctional staff including handwashing, proper wearing of masks, and cleaning cells once occupied by an inmate infected with COVID-19, are claims to be addressed by Kansas correctional staff through available administrative remedies. *See* ECF No. 7 at 2.

More disturbing and problematic is Blake's allegation, which he raises for the first time in his reply, that on September 3, 2020, he was forced into a restraining chair and injected with morphine and fentanyl against his will because it was believed he was suffering from a stroke. ECF No. 7 at 4. He adds that the incident was orchestrated when Kansas prison officials called "a use of force code" to justify restraining him in the chair. *Id*. He states that there was no existing "mental health emergency;" rather, because prison staff and a nurse determined he was having a stroke despite his "constant verbal denial" or other symptoms of a stroke, they administered an IV and medicated him without his consent. *Id*. To the extent this incident involved a use of force, the Maryland Division of Correction should have received a report about the incident. As with its other deficient responses, Defendant has failed to address this allegation with documentary or other evidence that will enable the Court to assess the merits of Blake's claims. Defendant will be directed to provide all information received from Kansas concerning the September 3, 2020 incident.

**IV.     Access to Courts and Retaliation**

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). However,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating

> capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id*. at 399.

Here, there is little to no evidence that Blake's transfer to Kansas has caused him to lose meaningful access to courts. At most, Blake has alleged that mail sent to him from the Circuit Court of Baltimore City, in one case and on one occasion, did not make it to him in Kansas in time for him to respond. While he mentions, for the first time in his reply, that there is a non-disclosure requirement in connection with his location in Kansas, such a requirement does not appear to have prevented him from providing his address to the state court in other cases. Mail delivery delays attributable to a litigant's failure to update the court of his current address do not support a finding that the Secretary of Public Safety has curtailed Blake's access to courts in violation of his First Amendment rights.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation

for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017). Plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.*

Unique to this case is Blake's assertion that the retaliatory actions taken against him concern actions taken by Kansas prison officials and therefore requires cancellation of the ICC contract with Maryland to house him in Kansas. Once again, the Defendant's response is woefully deficient. The absence of any evidence regarding the basis for the alleged adverse actions taken against Blake, such as his confinement to long-term segregation, denial of his presence at disciplinary hearings, and the use of force in connection with medication administration, forecloses

15

any opportunity to discern whether there were legitimate security concerns underlying those adverse actions.  Counsel for the Maryland Division of Correction will therefore be directed to address these deficiencies, both with evidentiary facts and legal authority.

### Conclusion

Because the Defendant's response to Blake's request for injunctive relief is woefully deficient, as pointed out above, it is impossible for this Court to rule on the following aspects of Blake's motion for injunctive relief: (1) denial of due process prior to being confined to long-term segregation; (2) excessive use of force related to the involuntary administration of medication; and (3) retaliation.  Blake's request for injunctive relief has been denied with regard to the following issues: (1) challenge to the ICC transfer; (2) supervisory liability based on medical malpractice; (3) correctional staff failures to follow proper COVID-19 protocols; and (4) access to courts. Further briefing on the issues will be required under the deadlines set forth in the separate Order which follows. In this regard, the Defendant will both attach the documentary records that have been ordered to be produced (with relevant language highlighted), and file a fully responsive memorandum that discusses the merits of these issues. Blake will be provided with an opportunity to reply.

February 12, 2021                                          /S/
Date                                                              Paul W. Grimm
                                                                     United States District Judge