**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SHAIDON BLAKE,
   *AKA: Shidon Blake*,

   Plaintiff,

   v.

ROBERT L. GREEN,
   *Secretary, Public Safety and Corr. Svcs.*

   Defendant.

Civil Action No.:  PWG-20-3563

## MEMORANDUM OPINION

In a Memorandum Opinion and Order dated February 16, 2021, this Court denied Plaintiff's request for injunctive relief seeking a transfer back to Maryland from Kansas, required counsel for the Maryland Department of Public Safety and Correctional Services ("DPSCS") to file documentation regarding Plaintiff's assignment to segregation and the disciplinary proceedings held in Kansas where he is now incarcerated, denied Plaintiff's request for injunctive relief in connection with his medical care and the COVID-19 precautions implemented by the Kansas Division of Correction ("KDOC"), required additional evidence regarding Plaintiff's claim that he was forcibly medicated during a suspected stroke, and required additional documentation supporting the adverse actions taken against Plaintiff by Kansas officials to address his claims that he was the subject of retaliation.  ECF No. 9.

Counsel for DPSCS filed a second response to this Court's Order to Show Cause.  ECF No. 15.  Plaintiff Shaidon Blake, who is proceeding pro se, filed a Response and a Supplemental Response.  ECF Nos. 16 & 17.  No hearing is necessary to resolve the issues remaining in this case.  *See* Local Rule 105.6 (D. Md. 2021).  For the reasons that follow, Blake's remaining requests for injunctive relief shall be denied and the complaint dismissed.

**Background**

**A.     Rationale for Interstate Transfer/Denial of Transfer Back**

The reason Blake was involuntarily transferred to Kansas through the Interstate Corrections Compact ("ICC") involves both the nature of his offense and his behavior during his incarceration in Maryland.  Specifically, Blake, who was a high-ranking officer in the Bloods gang, was convicted of murdering a member of the Bloods gang in Baltimore.  Evidence at his trial established that he came to Baltimore from California "to reform Baltimore Bloods and discipline members who did not comply."  ECF No. 15-7 at 1.  The victim was perceived by Blake and his co-defendants as failing to live up to his responsibilities as a member of the gang.  The victim was then "disciplined" by Blake and three other individuals in the basement of a house in Baltimore where he was restrained, beaten, cut multiple times with a box cutter, and a Samurai sword was plunged into his neck, killing him.  *See Blake v. Wolf, et al.*, Civil Action PWG-13-1160 (D. Md. 2015) (Dec. 29, 2015 Memorandum Opinion, ECF No. 39).  The victim's body was then set on fire in a nearby alley and later discovered by neighbors who reported it to police.  *Id.*

According to Maryland DPSCS, Blake's case was "highly publicized in Maryland and other gang members easily recognized him."  ECF No. 15-7 at 1.  Blake was "no longer in good standing with the local population of Blood members."  *Id.*  They explain that while confined to Jessup Correctional Institution ("JCI"), "Blake was seen as one of the top leaders amongst the Bloods" who "would not act in the capacity of an informant, but rather as a representative for the group who would help maintain the peace and work with staff to resolve issues."[1]  *Id.*  "JCI Intel

---

[1] The report stating that Blake offered to be a go-between for correctional staff and inmates belonging to Security Threat Groups is reminiscent of testimony during his criminal trial regarding conversations between Baltimore police officers and Blake during which he offered to assist police to keep gang wars from breaking out.  Blake also penned such "offers" and filed them with this Court in the context of his federal habeas proceedings.  *See e.g., Blake v. Wolf*, Civil Action PWG-13-1160 at ECF No. 28 at 3-4.

2

staff reported that inmate Blake was eventually viewed as a 'snitch' by other Blood members and a hit was placed on him by the group." *Id*. at 1-2.

Reports from KDOC indicate that Blake has made numerous threats to staff and those reports were relied upon by Maryland DPSCS to deny his request to return to Maryland:

> He has made numerous threats to staff and has received three disciplinary reports for threatening/intimidating staff during his incarceration in Kansas Department of Corrections. On 8/14/2020, the KDOC also reports that during a recent off-site transport Blake stated staff were 'messing with him' and if staff didn't leave him alone, he is going to 'make shit happen.' Additionally, the KDOC reported that Blake has also stated that he is the only inmate who can "unite the entire compound regardless of gang affiliations; There will be war." Blake also stated that 'if anyone touches me they will fucking die. My guys will pull up on their house." Blake also claims to have a great authority within the Bloods and a Jamaican gang. Blake continued stating they will come over whenever he needs them and will take care of the "problems". . . . **This amounts to verification that Blake's threat to others, including DPSCS staff, still exists; therefore, he should not be returned to Maryland**.

ECF No. 15-7 at 2 (emphasis supplied). In addition to the reports regarding threats made by Blake, he also placed an unauthorized three-way call to Patricia Smith, a Case Manager Specialist whose signature appears on documents denying Blake's request for transfer back to Maryland. *Id*., *see also id*. at 9. The conversation between Blake and Smith did not include any threats by Blake; rather, Blake simply voiced his numerous complaints against KDOC employees and his treatment in Kansas. *Id*. at 9.

**B.     Disciplinary Record in Kansas**

Blake's disciplinary record in Kansas includes charges that he was inebriated, possessed contraband and weapons, and made threats to KDOC staff. On December 23, 2018, Blake was charged with threatening an officer when he was seen wearing leather gloves, refused orders to remove the gloves, and advanced toward the reporting officer in "an angry manner." ECF No. 15-

3 at 29. He was found guilty of threatening an officer and disobeying orders on December 31, 2018. *Id*. at 31.

On January 30, 2019, Blake was charged with making threats against an officer when he complained to the reporting officer[2] that Officer Browning was "disrespectful" and that "if that bitch talks to me like that again she needs to know I'll hurt her, they will put me on a plane and get me out of here." ECF No. 15-3 at 24. Blake went on to say that he was "past the point of caring what happens, but there are consequences for her actions and she needs to pay." *Id*. In a waiver form dated February 4, 2019, which is signed by Blake, he waived his right to a hearing, *id*. at 28, and was found guilty, *id*. at 26-27.

On March 3, 2019, Blake was charged with fighting when an officer observed him engaged in a fight with another inmate in the chow hall. ECF No. 15-3 at 18. Blake was pulled to the ground and restrained "with mechanical restraints." *Id*. According to the documents filed, Blake entered a plea of guilty to the charge on March 5, 2019. *Id*. at 20 and 22. No hearing was held, and the penalty imposed is not reflected in the record before the Court. *Id*. at 23.

On April 4, 2019, Blake was charged with disobeying an order and interference with cell operation for hanging a blanket that blocked the view into the cell. ECF No. 15-4 at 116. Blake waived his right to a hearing, *see id.* at 118, and he was found guilty of the charges. *Id*. at 120-21.

On May 17, 2019, Blake was charged with possession of sexually explicit materials and theft when a search of a box of his legal materials uncovered 20 photographs depicting nude women and a hot pot belonging to another inmate. ECF No. 15-4 at 123. Blake waived his rights to a hearing, *see id*. at 124, but there is no record of the disposition on this case.

---

[2]     "Reporting officer" or R/O refers to the correctional officer charging Blake with a rule violation.

On May 30, 2019, Blake was charged with possession of dangerous contraband and disobeying orders. ECF No. 15-3 at 15. The reporting officer observed Blake with a homemade weapon consisting of a "ice pick style" knife that was six inches long. The officer ordered him to drop the weapon "several times." *Id*. When Blake did not comply with the orders, pepper spray was deployed to gain his compliance. *Id*.

On June 9, 2019, Blake was charged with disobeying orders, insubordination, and interfering with official duties. ECF No. 15-4 at 125. Because Blake was on disciplinary segregation at the time, he was not provided with a recreation cage containing a phone. *Id*. Blake argued with the officer and went into a cage that had a phone and refused to come out because, in his view, he should have gotten a phone call. *Id*. Blake waived his right to a hearing and was found guilty on the charges alleged. *Id*. at 127-29.

On July 18, 2019, Blake was charged with possession of dangerous contraband. ECF No. 15-4 at 16. Blake was asked by an officer if he had any weapons and he replied that he did, pulling out an eleven-inch homemade weapon from his waist band. *Id*. Blake did not contest the charge, and he was found guilty. *Id*. at 13. On that same date, Blake was charged with fighting another inmate. *Id*. at 107. After Blake waived his rights to a hearing, *see id.* at 110, he was found guilty of the fighting charge, *id*. at 112.

On October 23, 2019, Blake was charged with threatening or intimidating an officer after he became "upset because he was not allowed to take personal property with him to the shower." ECF No. 15-3 at 44. Blake is reported to have said he could make "'shots fired'" and that he was from another State and was sent to Kansas "because of how bad a person he is," and he told the officers present that they "better watch [themselves] because he is the 'real thing.'" *Id*. Blake maintained that he never threatened staff and that the officers involved apologized to him for

writing him up.  *Id*. at 47.  Testimony was provided by Blake, his cellmate, and the reporting officer.  *Id*. at 52.  While Blake and his cellmate testified that Blake never threatened the officers and the charges against Blake were the result of a misunderstanding, the reporting officer denied Blake's account of conversations that took place after the charges were made.  *Id*. at 52-53.  Blake was found guilty and sentenced to 60 days segregation and fined $20.  *Id*. at 54.

On March 19, 2020, Blake was charged with disobeying orders by hanging a "curtain" in his cell.  ECF 15-4 at 18.  A fine of $5 was imposed.  *Id*.

On March 30, 2020, Blake was charged with use of stimulants, sedatives, unauthorized drugs, or narcotics or the misuse of or hoarding of authorized or prescribed medication, possession of dangerous contraband, possession of tobacco contraband, and theft.  ECF No. 15-3 at 1.  The charges were the result of a search of Blake's cell during which the reporting officer found rolled toilet paper wrappers containing a leafy green substance, a rolled burnt piece of paper, a lit candle, 14 raw eggs and an onion, and a small burnt plug extension.  *Id*.  Blake was also described as having slurred speech and red eyes and, as he tried to walk, he stumbled.  *Id*.  A waiver form dated April 2, 2020, indicates that Blake waived his rights and entered a plea of guilty.  *Id*. at 8.  Nevertheless, the charge for being intoxicated was dismissed due to lack of evidence because neither Blake nor his cellmate were taken to medical.  *Id*. at 10.  As a penalty for the remaining charges, Blake was fined $30 and required to serve 90 days in segregation.  *Id*. at 11.

On April 25, 2020, Blake was charged with disrespecting an officer after he began telling an officer in his housing unit that he should not have had a conversation with the unit team leader. ECF No. 15-4 at 19.  According to the report, Blake began yelling at the officer and telling him that he, Blake, "ran this house" and the officer needed to "sit [his] ass down and mind [his] own business."  *Id*.  Blake was fined $10 for the offense.  *Id*.

On May 10, 2020, Blake was charged with "Security Threat Group" after he became argumentative with the reporting officer who had ordered Blake to go into his cell. ECF No. 15-4 at 20. After giving Blake "one last directive to go inside," the reporting officer heard him say "Love Blood!" to another inmate. *Id*. The statement was attributed to Blake's association with the Bloods. *Id*. At a hearing on June 11, 2020, Blake testified that he was not promoting a gang, but admitted that he was a member of the Bloods his "whole life." *Id*. at 23. The hearing officer found that it was more likely than not that Blake violated the rule cited and imposed a sanction of 30 days segregation and a $15 fine. *Id*. at 22.

On June 18, 2020, Blake was charged with possessing dangerous contraband after a search of his cell revealed he was in possession of a "homemade stabbing device." ECF No. 15-3 at 34 & 35. In the record of a hearing held on June 22, 2020, it is indicated that Blake pleaded guilty to Officer Allison when Blake was served with the report of the offense. *Id*. at 42. Blake was given a total of 75 days in restricted confinement as a penalty for this offense. *Id*. at 43.

On July 19, 2020, Blake was charged with possession of dangerous contraband, threatening and intimidating, disruptive behavior, and "Security Threat Groups." ECF No. 15-3 at 55. The charges were the result of a cell search during which Blake, contrary to orders to sit down outside of his cell and wait, stood at the top of the stairs outside of his cell yelling at the officer who was searching the cell. *Id*. Despite orders to stop yelling, Blake continued to yell even louder. *Id*. The cell search was prompted by an officer's observation that a smell of smoke was emanating from the cell. *Id*. The search turned up "smoking material" found in the toilet, as well as a homemade lighter, and "a drawing of crowns stating legacy" believed to be related to a Security Threat Group. *Id*. A hearing was held on July 28, August 11, and August 12, 2020, during which Blake, the reporting officer, and Officer Blair, who Blake reportedly threatened, testified. *Id*. at

71-72.  Blake maintained that he was asleep in his cell when the officers came to search the cell; his assertion was confirmed by Officer Blair.  *Id*. at 71.  Blair also testified that Blake's cellmate appeared to be in an altered state when the cell was searched and that it was Blake who dropped something in the toilet just prior to the officer entering the cell to search it.  *Id*. at 71-72.  The hearing officer found that the drawing depicting "three pointed crowns" is a STG (Security Threat Group) related image.  *Id*. at 72.  Blake was found guilty of having "security threat group material, dangerous and tobacco contraband."  *Id*.  Blake was sanctioned with a fine of $15 as well as 90 days of segregation.  *Id*. at 73.

On July 17, 2020, Blake was charged with being in a state of altered consciousness, hoarding medication, and possession of dangerous contraband.  ECF No. 15-4 at 28.  The reporting officer noticed a smell of smoke coming from Blake's cell and observed Blake holding "a hand-rolled smoking device commonly known as a 1-Hitter."  *Id*.  When Blake was ordered to relinquish control over the device, he dropped it on the floor and placed his foot on top of it.  *Id*.  When he was ordered to give the device to the officer, Blake bent over to pick it up and the officer noticed he had a "staggered" gait.  *Id*.  Blake's speech was also slurred.  *Id*.  When Blake's cell was searched, the officer found: "26 additional 1-Hitter pipes, 22 pieces of toilet paper wrapper in various sizes, 3 burnt wires, 5 altered pencil leads, 1 burnt ID clip, 1 bottle of nitroglycerin pills (which were not prescribed to either offender), 1 piece of sand paper, 16 full PPE gloves, 6 PPE gloves with the fingertips removed, 12 glove fingertips, 12 hand-rolled cigarettes containing a multi-colored leafy substance, 3 tied glove fingertips containing an unidentified substance, a burnt surge protector, a lamp registered to an offender Brown . . . , and a fan registered to offender Williams . . . , which offender Blake claimed ownership of."  *Id*.  At a hearing held over five days, it was verified that Blake had a prescription for the nitroglycerin pills; and the substance found in

Blake's cell tested positive for synthetic cannabinoids. *Id.* at 41. During the third day of the hearing, Blake allegedly made "disrespectful comments towards [the reporting officer] and had been warned several times but continued the comments." *Id.* Blake was on a phone during the hearing and hung up after several warnings; the hearing officer noted that "[h]earings are now in absentia" and "staff assistance will be assigned." *Id.* During the fourth day of the hearing, Blake's assigned staff assistant, "Unit Team Knapp" offered no questions or witnesses and Blake was found guilty of all the charges except hoarding medication in connection with the nitroglycerin pills. *Id.* He was sentenced to segregation for a period of 285 days and fined a total of $45. *Id.* at 42.

On July 18, 2020 at 1:00 a.m., Blake was charged with possessing sexually explicit materials, possession of dangerous contraband and tobacco, theft, and being in a drunken or intoxicated state. ECF No. 15-4 at 45. These charges were the result of a cell search during which Blake was found to possess "three sticks of leafy green substance," an envelope containing thirteen sexually explicit photographs, a "burnt power surge protected with burnt lead and melted outlets," and observation that Blake could not stand straight or speak without slurring his words. *Id.* A hearing was held on August 17, 2020, in absentia based on Blake's prior "disrespectful comments" towards a reporting officer. *Id.* at 56. The staff member assigned to assist Blake in the hearing asked no questions and called no witnesses and said that neither he nor Blake had anything to add. *Id.* Blake was found guilty on all charges and sentenced to serve a total of 225 days of segregation and fined $50. *Id.* at 57.

Blake also received another disciplinary report on July 18, 2020 at 11:30 p.m. for possession of contraband and being in an altered state of consciousness from a different officer. ECF No. 15-4 at 58. The reporting officer stated that he was conducting count when he noticed

that there was burnt rolled paper inside of Blake's cell. *Id*. After having the cell door opened, Blake was ordered to hand over all of his dope and the officer noticed Blake could hardly speak and seemed confused. *Id*. When the officer entered the cell, he saw "a lot of loose leafy green substance" as well as "many rolled burnt papers and a burnt power surge protector." *Id*. The hearing record[3] for this disciplinary report is not included with the documents submitted, but there is a "disposition and hearing record" indicating that Blake pleaded not guilty and was found guilty of the charges. *Id*. at 70. This hearing was also held in absentia. *Id*.

On July 22, 2020, Blake was charged with disobeying orders and being out of place after an officer told him to get off the phone and return to his cell and Blake ignored three orders to do so. ECF No. 15-4 at 73. Blake participated in a hearing held on July 28, 2020 and explained that the officer did not say anything to him until he hung up the phone but admitted he should have been in his cell. *Id*. at 80. Blake was found guilty of the violations and sentenced to 30 days of segregation and a $15 fine. *Id*. at 81.

On August 4, 2020, Blake was charged with disobeying orders, possession of dangerous contraband, and possession of tobacco. ECF No. 15-4 at 82. Blake was seen by the reporting officer "roll like a cigarette in his hands," and when the officer told Blake to give him what he had, Blake "dumped [it] into the toilet." *Id*. The substance found in the toilet is described as a rolled brown leafy substance. *Id*. On August 17, 2020, a hearing was held, and Blake was sworn in, entered a plea of not guilty, and stated the reporting officer was lying. *Id*. at 90. Blake reportedly made "disrespectful comments towards" the reporting officer, was repeatedly warned to stop, and ultimately hung up the phone. *Id*. The hearing was continued until the following day and resumed

---

[3]    A hearing record for a different inmate, Calvin Frenzley, is included with the documents related to this disciplinary report, apparently in error. ECF No. 15-4 at 71-73.

in absentia with "Unit Team Knapp" assigned as staff assistant for Blake. *Id.* The reporting officer provided an email stating that the report stands as written, and no other evidence or testimony was provided; Blake was found guilty. *Id.* Blake received a total of 165 days of segregation and a $20 fine. *Id.* at 91.

On August 10, 2020, Blake was charged with misuse of the telephone for making an unauthorized three-way call. ECF No. 15-4 at 92. A hearing was held in absentia on August 17, 2020; a notation was made that Blake made disrespectful remarks to the reporting officer, ignored warnings to stop, and hung up the phone. *Id.* at 97. There is no information about the "disrespectful remarks." *Id.* The hearing was continued to the following day and a staff assistant was assigned for Blake; no questions or witnesses were called, and Blake was found guilty. *Id.* Blake received a 30-day segregation sentence. *Id.* at 98.

On October 14, 2020, Blake was charged with misuse of the telephone for making a three-way call in connection with the call to Patricia Smith. ECF No. 15-4 at 99. Blake pled guilty to the charge and received 30 days segregation. *Id.* at 104 & 106.

In a disciplinary report dated October 9, 2010,[4] Blake was charged with lying and insubordination. ECF No. 15-4 at 1. The reporting officer alleged that Blake told him he needed a trash bag because he did not have one. *Id.* Upon inspection, the officer determined that Blake had two trash bags, one in his trash can and one in his sink that was filled with ice. *Id.* Blake accused the officer of playing games and making up his own rules when the officer declined to give him a trash bag. *Id.* According to the officer, Blake then "made it clear that he was not in prison for 'jaywalking or playing games.'" *Id.* Blake pleaded guilty to the charges and received 30 days of segregation and a $5 fine. *Id.* at 8 and 9.

---

[4] Although the date on this report appears to be a mistake as Blake did not arrive in Kansas until 2018, all related reports also use the same year of 2010. ECF No. 15-4 at 1-12.

## C.  Use of Force Incident

On September 3, 2020, Blake was observed at the door of his cell "behaving abnormally." ECF No. 15-6 at 3.  He had been yelling out of the door the entire shift, but when the officer got to Blake's cell, he was speaking quietly with slurred speech, said he was feeling pressure in his chest and did not feel well.  *Id*.  Blake's face was drooping, and he had difficulty maintaining balance.  *Id*.  A registered nurse was called to the area and she determined that Blake needed to be moved to a medical room for assessment.  *Id*.  Blake was taken to that area via wheelchair.  *Id*. The nurse contacted the on-call doctor who determined that Blake should be transported to the local hospital.  *Id*.

When Blake was informed of this plan, he refused to go to the hospital and demanded a refusal form.  ECF No. 15-6 at 3.  Staff present at the time told Blake he could not refuse to go to the hospital because he had symptoms of a life-threatening condition.  *Id*.  Blake continued to argue and stated he would resist escort and attempt to fight any escorting officers.  *Id*.  After conferring with a Captain, a call was made for a mobile restraint chair to be brought to the area, and Blake began to get down from the examination table.  *Id*.  The two officers who were there, physically placed Blake back on the table.  *Id*.  Once the response team arrived with the mobile restraint chair, Blake did not resist being put into the chair and taken to the trauma room to be assessed by EMS.  *Id*.  Blake was escorted to the hospital by other officers.  *Id*.  The incident was video recorded.  *Id*. at 5.  An email dated September 3, 2020, from Laura Christian, the registered nurse involved in the incident, indicates that EMS staff medicated Blake for pain and transported him to the hospital.  ECF No. 15-6 at 9.  There is no explanation given regarding why Blake needed pain relief.

### D.     Blake's Reply

Blake maintains that the rationale provided by Maryland DOC for his interstate transfer is not true and contains contradictory information. ECF No. 16 at 1. He claims that there "are many gang members in Maryland prisons and they are active," but Blake is not an active member of the Bloods. *Id*. In Blake's view, the assertion that he offered to act as a peacemaker to resolve issues contradicts the claim made by Maryland DOC that he is involved in a gang and makes threats towards correctional staff. *Id*. Rather, he contends his transfer to KDOC was in retaliation for accessing the administrative legal process and court actions to remedy violations of his civil rights. *Id*. He also asserts that he has been the subject of retaliation by Kansas correctional staff for the same reason. *Id*.

Blake further asserts that KDOC staff have violated the law because they are not sending information regarding serious incidents to Maryland officials. ECF No. 16 at 2. He claims that there was a serious incident on September 25, 2020, where correctional officers used a chemical agent against him, Blake was charged with battery to "cover up" the use of excessive force, and he was ultimately found not guilty of the battery charge. *Id*. Defendants do not provide any information regarding the September 25, 2020 incident.

Blake claims that he was never afforded a hearing for KDOC disciplinary reports from September 17 to 18, 2020, and he concludes that this calls into question "any and all" disciplinary reports written by KDOC staff. ECF No. 16 at 2. Blake attaches to his reply over 200 pages of exhibits. ECF No. 16-2 through 16-5. The exhibits include multiple grievances filed by Blake concerning missing property, being found guilty of disciplinary violations via in absentia hearings, harassment by staff, and medical care provided to him against his will. In one exchange between Blake and the KDOC Enforcement, Apprehension, and Investigations ("EAI") Division, Blake

challenged their conclusion that the picture of a three-pointed crown that was found in his cell was gang related. ECF No. 16-3 at 14-15. Blake asserts that Bloods do not "rock a crown" of any kind and that the EAI would know this if they had done a "simple Google or/(and) Wikipedia search." *Id*. The EAI's response makes clear that (1) a three-pointed crown is a security threat group symbol; and (2) it does not matter that it is not a Bloods' symbol. *Id*. at 13. The letter notes that Blake's history "revealed that [he has] been convicted [of] 22 Class I Policy violations in the last 6 and a half months with 14 more Class 1 violations since December 2018." *Id*. The letter concludes that:

> The fact that you wrote your Form-9 in red ink and the significance of that specific color choice is not lost on me. I would highly recommend you use black ink or pencil for future correspondence. As you are well aware, red is the color associated and identified with the security threat group, Bloods. As such the use of red ink by a validated Blood member is also considered a violation of KAR 44-12-325 which, again states in part, "*Inmates shall not develop, organize, **promote** or assist any security threat group….*"

*Id*. (emphasis in original).

Based on Blake's disciplinary record, KDOC has assigned him to segregated housing for "consistent bad behavior" ("CBB"). *See* ECF No. 15-5 at 1, *see also* ECF No. 16-3 at 17 (Admin. Segregation Report, July 2019). In a grievance form dated October 1, 2020, Blake asked why he had been placed in a restricted cell when he first arrived at El Dorado Correctional Facility ("EDCF"). ECF No. 16-4 at 17. In response to the grievance, Blake was advised that he was placed in "a limited contact cell with no access to a phone, for the Battery on staff DR [he] received on 9/25/2020 while housed at Lansing Correctional Facility." *Id*. at 19. He was further advised that this "placement was necessary to monitor [his] behavior for a period of time, until [his] behavior warranted placement in a regular cell." *Id*. On October 5, 2020, Blake was put into a regular cell with access to phone privileges. *Id*.

When Blake asked about being released from segregation on February 9, 2021 because he had completed his six months of segregation time, he was advised that he had "25 Class 1 DR's in 2020, last being Oct. 2020 – less than six mo[nths]" and that he was being "managed in CBB" based on his history. ECF No. 16-3 at 3.

With regard to the rationale for holding Blake's disciplinary hearings in absentia, Blake states that he was merely presenting his defense and was not allowed to do so by the hearing officer. He claims the hearing officer, Sgt. Randolph, asked for his defense but then refused to hear it. ECF No. 17 at 2. Blake's defense amounted to stating that the reporting officer lied on her report, alleging she "maintains a relationship [with] a prisoner," and that she "stays under the influence of drugs while on shift." *Id.* Blake recalls that he presented this defense outside of the reporting officer's presence and when he refused to withdraw his testimony, the hearing officer hung up the phone. *Id.* Blake admits that he was warned several times to stop but adds that the hearing officer also told him to withdraw his pending lawsuit against Warden Paul Snyder. *Id.* at 3. He maintains that the hearing officer and the reporting officer are friends and that is why his defense was not accepted. *Id.*

Blake's asserts he was forcibly medicated when, after he declined medical treatment when it was suspected he was having a stroke, an IV was put into his arm and he was taken to the hospital. ECF No. 16 at 3-5. He states that the record prepared by KDOC staff who were involved establishes that he was not resisting but was nevertheless held on the table and put into a restraint chair to be moved to the trauma room. *Id.* He claims he did not trust medical staff due to a mistake made with his medication when he was incarcerated in Maryland. *Id.* at 4.

## Discussion

This Court directed the Maryland Division of Correction to supplement its anemic response to the Order to Show Cause due to the lack of explanation provided for the initial reason why Blake was involuntarily transferred to Kansas as well as the failure to provide documentation from KDOC indicating why Blake has been subjected to segregated confinement for much of the time he has been held in Kansas. Further, the initial response provided by counsel did not include "any evidence regarding the basis for the alleged adverse actions taken against Blake, such as his confinement to long-term segregation, denial of his presence at disciplinary hearings, and the use of force in connection with medication administration" and therefore foreclosed "any opportunity for this Court to discern whether there were legitimate security concerns underlying those adverse actions." ECF No. 9 at 15-16. The issues remaining before the Court concern Blake's request for injunctive relief based on his claims that he was denied due process prior to being confined to long-term segregation; excessive use of force was used to involuntarily administer medication to him; and he has been subjected to retaliation with regard to his transfer to Kansas and the conditions of his confinement in Kansas. *Id*. at 16.

## Standard of Review

As previously noted by this Court, "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), *see also SAS Institute, Inc. v. World Programming Lmtd*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying four-prong test is "a high bar, as it should be."). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the

injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

The Interstate Corrections Compact ("ICC") makes clear that Blake's status as a Maryland inmate remains unchanged. *See* Md. Corr. Ser., Code Ann. § 8-605(c). The ICC provides that "[a]ll inmates who may be confined in an institution pursuant to the provision of this Compact shall be treated in a reasonable and humane manner and shall be treated equally with such similar inmates of the receiving state as may be confined in the same institution." *Id.* at § 8-605(e). Blake also retains "any legal rights which [he] would have had if confined in an appropriate institution" in Maryland. *Id.* Thus, the benchmark for examining Blake's claims is whether, under similar circumstances, Blake would have been entitled to more than what he received in Kansas had he remained in Maryland.

## A.     Long Term Segregation

A liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U. S. 472, 484 (1995). Whether Blake was entitled to due process before being assigned to long term segregation or to CBB status hinges upon whether the conditions under which he has been confined constituted an atypical and significant hardship. Assignment to administrative segregation alone does not create an atypical and significant hardship. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983) (holding that administrative segregation is part of the ordinary incidents of prison life). The Supreme Court found that conditions in a super-maximum prison where human contact and

communication between cells was forbidden and exercise was limited to one hour a day in a small indoor room were not enough alone to implicate liberty interest. *See Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Rather the duration of the confinement to the prison enforcing those conditions created a liberty interest in avoiding a transfer there. *Id.* The *Wilkinson* prisoners received only annual reviews and "even inmates with exemplary behavior rarely progress[ed] through [the prison] in less than two years." *Austin v. Wilkinson*, 189 F. Supp. 2d 719, 740 (N.D. Ohio 2002).

There is no evidence here that Blake has been subjected to conditions of confinement that are atypical and substantially harsh. His designation on CBB status directly relates to his chronic violation of prison rules, and he is provided a monthly review of his long-term segregation assignment, similar to the monthly reviews provided to inmates confined to administrative segregation in Maryland prisons. Blake's confinement to segregation does not approach the draconian conditions condemned by the Supreme Court in *Wilkinson*, nor does it run afoul of the due process protections he would otherwise receive if confined in Maryland.

## B.    Involuntary Medication

Although the supplemental response contains cursory statements that Blake was not subjected to involuntary medication, this was clearly not the case. When Blake was assessed for stroke-like symptoms and expressed his desire to waive any right to treatment, he was held down, placed in a restraint chair, and administered IV medications. In Blake's view, this was a blatant violation of his constitutional right to refuse treatment.

The Fourteenth Amendment ensures that states will provide not only for the medical needs of those in penal settings, but for anyone restricted by a state from obtaining medical care on his own. *See DeShaney v. Winnebago*, 489 U.S. 189, 200 (1989). Maryland recognizes a prisoner's right to refuse non-emergency medical treatment when the prisoner is competent, is not engaging

in a protest against prison policies, and is not attempting suicide. *See Stouffer v. Reid*, 993 A.2d 104, 108 (Md. 2010). The Fourth Circuit has also recognized that forcing a prisoner to undergo surgery to remove penile implants runs afoul of the Fourth Amendment's prohibition against unreasonable searches and seizures, recognizing that prisoners maintain "some legitimate expectation of privacy in his person." *King v. Rubenstein*, 825 F.3d 206, 215 (4th Cir. 2016). While it is well-established that prisoners have a due process right to avoid the unwanted administration of psychotropic medications, *see Washington v. Harper*, 494 U.S. 210, 221-22 (1990), a different standard applies when the medication is required—in the view of a medically trained professional—on an emergency basis to protect the prisoner from imminent, self-inflicted harm. *See Hogan v. Carter*, 85 F.3d 1113, 1117 (4th Cir. 1996) (full adversarial due process hearing is not required before emergency administration of psychotropic medication).

Here, Blake was evaluated by a registered nurse who determined he was likely having a stroke given the symptoms he was exhibiting. Given that assessment, Blake's well-established pattern of drug use, and the exigencies of the circumstances, KDOC staff were not required to engage in an intellectual discussion regarding whether Blake had a right to refuse medical treatment and the wisdom of such refusal. Where, as here, it is sincerely believed that a prisoner's life is at stake, overriding his stated refusal of potentially life-saving medical care does not violate the due process clause of the Fourteenth Amendment or the Eighth Amendment's prohibition against cruel and unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (prison officials are liable under the Eighth Amendment when they know of and disregard excessive risk to inmate health or safety). Accordingly, Blake's claim that his involuntary medication amounts to inhumane conditions of confinement in KDOC fails.

## C.    Retaliation

Blake alleges his transfer to KDOC amounts to retaliation by Maryland officials and that the adverse conditions under which he is confined amounts to retaliation by KDOC officials. He claims the retaliatory actions were taken because of his resort to legal remedies through administrative complaints and court actions.

In order to establish a claim of retaliation, the claim "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   It is unclear how much of a showing of retaliatory adversity must be made in order to survive a motion for summary judgment. *See Burton v. Livingston*, 791 F.2d 97, 100-01 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state a claim).   "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (*judgment vacated on other grounds*, 525 U.S. 802 (1998) (conclusory allegations of retaliation insufficient to state claim), *see also ACLU of Md., Inc. v. Wicomico Cty, Md.,* 999 F.2d 780, 785 (4th Cir. 1993) (showing of adversity is essential to any retaliation claim).

Having already concluded that Blake's confinement to segregation in KDOC is supported by the record and is not so harsh as to trigger due process concerns, the actions taken by KDOC do not present a sufficient adversity to support a retaliation claim.  Moreover, Blake's disciplinary record depicts a recalcitrance on his part that supports a legitimate goal of maintaining internal order and discipline.  Additionally, Blake's claims that KDOC staff are corrupt and the appeals

process for disciplinary reports is a fruitless endeavor fail to substantiate his allegation that he has been singled out for harsh treatment. Blake's insistence, for example, to simply malign a reporting officer's character as a "defense" to a rule violation provides no support for his claim of unfair treatment by KDOC staff, much less suggests that his rights have been violated.

Assuming Blake's transfer to Kansas by Maryland officials is sufficiently adverse, his claim that the transfer was retaliatory is insufficient due to his failure to show that retaliation for his protected conduct was the "substantial" or "motivating" factor. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Blake must establish that the Maryland authorities' decision to involuntarily transfer him to Kansas did not advance legitimate goals of the correctional institution and were not narrowly tailored to achieve such goals. *See Rizzo v. Dawson*, 778 F. 2d 527, 532 & n. 4 (9th Cir. 1985). Preservation of internal order and discipline is a legitimate goal of correctional institutions. *Id.* at 532. "In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72,74 (4th Cir. 1994)).

Maryland officials have provided a legitimate rationale to support Blake's involuntary transfer that is unrelated to his resort to the courts. The focus on Blake as a possible informant by the Maryland inmate population, his well-known participation in the murder of a member of the Bloods gang, and his seeming inability to either appreciate the danger he was in or to do anything to mitigate it, are all legitimate reasons that overcome any possibility that the transfer was retaliatory. Blake's refusal to believe his life was endangered by general population inmates in Maryland, simply elevates the need for his transfer. The possibility of violence fomented by Blake is sufficiently supported by the record before this Court. *See e.g.,* ECF No. 16 at 6-7 (Blake's

explanation that he possessed a weapon because he heard members of a gang were going to assault him). Maryland correctional officials are not obliged to stand by and wait for violence to erupt before taking action to remove the catalyst for the violence from their prisons. Finally, this Court's role does not include the micromanagement of prisons within its jurisdiction, nor is it this Court's role to reverse well-founded decisions to transfer a prisoner to another jurisdiction to halt the possibility of violence and aggression.

**Conclusion**

Having found no basis for concluding that Blake's transfer was retaliatory or that he has been subjected to inhumane conditions of confinement in the receiving state as required by the ICC, the remaining requests for injunctive relief shall be DENIED and this case CLOSED.

A separate Order follows.


___July 15, 2021_____                          _____/S/_____
Date                                           Paul W. Grimm
                                               United States District Judge